**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO: 06-cv-01212-WYD-BNB

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.,
a Colorado corporation,

Plaintiff,

vs.

SDMS, INC., a California corporation,
THOMAS P. ANDERSON, an individual, and
KENNETH PECUS, an individual,

Defendants.

---

SDMS, INC., a California corporation,
THOMAS P. ANDERSON, an individual, and
KENNETH PECUS, an individual,

Counter-claimants,

vs.

ROCKY MOUNTAIN CHOCOLATE FACTORY, INC.,
a Colorado corporation,

Counter-defendant.

---

**DEFENDANTS' AND COUNTER-CLAIMANTS' OPPOSITION**
**TO PLAINTIFF AND COUNTER-DEFENDANT'S**
**MOTION FOR SUMMARY JUDGEMENT**

---

Defendants and Counter-Claimants Thomas P. Anderson ("Anderson"), Kenneth Pecus ("Pecus") and SDMS, Inc. ("SDMS") (collectively, "Defendants" and/or "Counter-Claimants"), through their counsel, hereby oppose Plaintiff Rocky Mountain Chocolate Factory, Inc.'s ("RMCF") Motion for Summary Judgment ("RMCF Motion") based upon the following:

## INTRODUCTION

In its Motion for Summary Judgment, filed on August 24, 2007, RMCF seeks summary judgment as to liability with regards to its affirmative claim for breach of contract and, as to all Counter-Claims. (Doc. No. 133). Because RMCF's breach of contract claim wholly relies upon the existence of an enforceable contract between the parties and, because a favorable determination on either Counter-Claimants' first, fourth or fifth cause of action will result in rescission of all agreements existing between RMCF, Anderson, Pecus and SDMS, this response shall first address Counter-Claimants' opposition to Plaintiff's motion with regards to the eight counter-claims for relief.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Facts Relevant to Plaintiff's Claims and Case Background

1. Defendants and Counter-Claimants lack sufficient information and/or belief to either admit or deny the alleged statement of fact contained at paragraph 1 of the RMCF Motion with regards to their treatment of other franchisees. Defendants and Counter-Claimants admit that RMCF granted *them* the right, pursuant to a written franchise agreement, to develop and operate a Rocky Mountain Chocolate Factory store.

2. Defendants and Counter-Claimants lack sufficient information and/or belief to either admit or deny the alleged statement of fact contained at paragraph 2 of the RMCF Motion

with regards to their treatment of other franchisees. Defendants and Counter-Claimants admit that Anderson attended a training program conducted by RMCF wherein he was provided a copy of the RMCF Operations Manual and recipe book. However, Defendants and Counter-Claimants specifically deny that all information provided to them, either by oral representation at training or by written disclosure, should be considered "valuable trade secrets." Not only does RMCF fail to take adequate steps to protect any alleged "trade secret material,"[1] recipes provided by RMCF can also be found in public forums, and the allegedly trade secret "business model" touted by RMCF is no more than a recitation of basic Generally Accepted Accounting Principals ("GAAP") and common information pertaining to employee and customer service principals. (Anderson Dec., ¶2, Exhibits B-2, B-3).

3. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 3 of the RMCF Motion.

4. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 4 of the RMCF Motion.

5. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 5 of the RMCF Motion.

6. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 6 of the RMCF Motion.

7. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 7 of the RMCF Motion.

---

[1] RMCF permits the attendance of individuals at the training program without the requirement of a confidentiality agreement, nor does it require each employee of a franchise location to execute a confidentiality agreement before being provided access to the RMCF recipe book or Operations Manual. Declaration of Thomas P. Anderson, paragraph #. (Future references to the Declaration of Thomas P. Anderson shall be listed as Anderson Dec. with paragraph (¶) numbers where appropriate.

8. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 8 of the RMCF Motion. However, Defendants' May 11, 2006 correspondence also included the following,

> Due to financial reasons I am unable to continue as a Rocky Mountain. The prevalent economic conditions at this location, as well as the cost structure has not allowed me to even break even these past two years. Please note that during the entire time I have been open, I personally have never been able to even take a paycheck home … The cost structure of the Rocky Mountain products does not allow a high enough markup for a profit at this location.

(Anderson Dec., ¶4, Exhibit B-4).

9. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 9 of the RMCF Motion.

10. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 10 of the RMCF Motion.

11. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 11 of the RMCF Motion.

12. a. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 12.a. of the RMCF Motion.

b. Defendants and Counter-Claimants admit that, between May and September 2006, they did not order Factory Candy from RMCF. Defendants and Counter-Claimants deny that they "needed" to order Factory Candy during that entire time period in order to stay in compliance with the RMCF Franchise Agreement.

c. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 12.c. of the RMCF Motion.

d. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 12.d. of the RMCF Motion.

13. Defendants and Counter-Claimants admit that RMCF's September 6, 2006 correspondence noted their failure to pay royalties and the existence of unapproved product as the reason for the Notice of Default.

14. Defendants and Counter-Claimants admit that they did not cure the monetary default listed in the September 6, 2006, correspondence within the prescribed ten-day time frame. However, upon firing existing counsel and retaining the advice of new legal counsel, on or about October 11, 2006, Defendants and Counter-Claimants did notify RMCF that they would be correcting the monetary deficiencies forthwith and would immediately remove all unauthorized product from their store. (Anderson Dec., ¶7; Declaration of Rebecca J. Fortune, paragraph 5[2]).

15. Defendants and Counter-Claimants deny the statement of alleged fact contained at paragraph 15 of the RMCF Motion. In an effort to remedy their allegedly breaching and/or deficient conduct, Defendants and Counter-Claimants hired new legal counsel and provided notice to RMCF, through that counsel on October 10th and 11th 2006, that they intended to do everything necessary to return to full compliance with the Franchise Agreement. (Fortune Dec., ¶5).

16. Defendants and Counter-Claimants admit that RMCF sent, and they received, a Notice of Termination dated October 11, 2006. Defendants and Counter-Claimants deny that the

---

[2] Future references to the Declaration of Rebecca J. Fortune shall be listed as "Fortune Dec." with paragraph (¶ numbers where appropriate.

sole motivation for the Notice of Termination was Anderson and Pecus' failure to pay royalties and/or sale of unauthorized product. As admitted in each of the depositions of RMCF executives and/or employees, never, in the history of RMCF, has a franchisee been terminated for either a failure to pay royalties or the sale of unauthorized product(s). More likely, RMCF's Notice of Termination was directly related to the notice given by Counter-Claimants, through their counsel on October 10, 2006, that, if RMCF were to persist in its unreasonable negotiating position, Anderson, Pecus and SDMS would be asserting several counter-claims against RMCF. (Anderson Dec., ¶8; Fortune Dec., ¶3).

17. Defendants and Counter-Claimants admit that they continued to operate their store as an RMCF Store after receiving the Notice of Termination. However, Defendants and Counter-Claimants never intended to use the RMCF Marks and/or Licensed Methods in a manner detrimental to RMCF. To the contrary, Defendants and Counter-Claimants, through their counsel, notified RMCF of their absolute intent to return to full compliance with RMCF's operational requirements, including the purchase of product and payment of royalties, pending the outcome of litigation. (Anderson Dec., ¶9; Fortune Dec. ¶5). To that end, on October 24, 2007, Defendants filed a Cross-Motion for Preliminary Injunction seeking the ability to do just that. (Doc. No. 27).

18. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 18 of the RMCF Motion.

19. Defendants and Counter-Claimants admit that, subsequent to the Court's ruling on December 8, 2006 forbidding them from operating as an RMCF franchisee pending the outcome of litigation, they have not paid any additional monies to RMCF for the benefit of their royalty

account. However, not only did Defendants and Counter-Claimants notice their intent to comply with the terms of the Franchise Agreement, including the payment of royalties, as stated in paragraph 17 above, they actually incurred the substantial cost and expense of filing a Cross-Motion for Preliminary Injunction seeking the same. Therefore, any damage RMCF suffered with regards to the lost royalties subsequent to October 2006 was due to its own actions in frustrating Defendants payment by filing its own Motion for Preliminary Injunction. (Doc. No. 25). Additionally, in an attempt to bring their account current, Defendants paid to RMCF the total amount of $6,422.80 by three separate checks dated September 1, 2006, September 5, 2006, and November 12, 2006. (Anderson Dec., ¶33, Exhibit B-7).

20. Defendants and Counter-Claimants admit the Court found that RMCF had demonstrated a likelihood of success on the merits of their trademark and breach of contract claims.

21. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 21 of the RMCF Motion.

22. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 22 of the RMCF Motion.

23. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 23 of the RMCF Motion.

**B. Facts Relevant to Defendants' Counterclaims**

24. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 24 of the RMCF Motion.

25. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 25 of the RMCF Motion.

26. Pecus admits that, from 2000 to 2006 he owned, and was partially responsible for the operation of two Powerhouse Gyms. However, realizing his lack of time and expertise to operate either or both gyms effectively, he sold one location in January 2006 and divested himself of substantial ownership in the second as of April 2006. (Declaration of Kenneth Pecus, paragraph 1)[3]. Anderson further denies that he had anything to do with the purchase, operation or control of either gym, at any time. Anderson merely possessed an interest in the business entity holding title to each gym as a result of being Mr. Pecus' domestic partner. (Anderson Dec., ¶12).

27. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 27 of the RMCF Motion.

28. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 28 of the RMCF Motion.

29. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 29 of the RMCF Motion. However, while Anderson and Pecus were provided an opportunity to review the Franchise Agreement before execution, they were not permitted to review the Operations Manual. Importantly, by the terms and conditions of the Franchise Agreement, Anderson and Pecus were also bound to obey all provisions and operating covenants contained within the Operations Manual. Further, it is the Operations Manual and <u>not</u> the

---

[3] Future references to the Declaration of Kenneth Pecus shall be listed as "Pecus Dec." with paragraph (¶ numbers where appropriate.

Franchise Agreement that completely addresses and explains the operating protocols for an RMCF franchisee including, but not limited to, RMCF product cost structure, suggested retail pricing, estimated employee hours and payroll, and authorized product and vendor information. (Anderson Dec., ¶3; Pecus Dec., ¶6).

30. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 30 of the RMCF Motion. However, while Defendants admit that early on in their depositions they were unable to recall an exact date and/or time line with regards to when the documents were received/reviewed/executed, subsequent questioning and testimony clarified each parties' recollection and both Anderson and Pecus were able to confirm their receipt and review of the Offering Circular prior to signing the Franchise Agreement. (Anderson Dec., ¶13; Anderson Depo. (attached as Exhibit A-6 to the Fortune Dec.) 72:1 – 73:3; Pecus Dec., ¶2; Pecus Depo. (attached as Exhibit A-7 to the Fortune Dec.) 104:1-105:25).

31. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 31 of the RMCF Motion.

32. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 32 of the RMCF Motion.

33. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 33 of the RMCF Motion.

34. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 34 of the RMCF Motion. However, it is important to note the budget prepared by Defendants' financial advisor was based solely on information provided by RMCF in connection

with their training program and *after* Anderson and Pecus' execution of the Franchise Agreement. (Anderson Dec., ¶14).

35. Defendants and Counter-Claimants admit to being successful in convincing RMCF that the recommended glass tables were not appropriate for Defendants' store due to the fact they were dangerous and came with a high risk of legal liability. (Anderson Dec., ¶15 Anderson Depo 182:11-25).

36. Defendants and Counter-Claimants admit that the RMCF Uniform Offering Circular ("UFOC") contains an Item 19 as stated at paragraph 36 of the RMCF Motion. However, RMCF's earnings claim also includes a listing of gross sales figures for the top 75% of all RMCF franchise locations. (Declaration of Greg Pope in Support of Plaintiff's Motion for Summary Judgment, Exhibit F, page 26, Doc. No. 133-2). Further, in a letter dated July 8, 2002 and, attached as Exhibit H to the Declaration of Romney Philpott in Support of Plaintiff's Motion for Summary Judgment (Philpott Dec., ¶8, Doc. No. 133-9), the State of California specifically notified RMCF that,

> 5. Relative to UFOC #19 Earnings Claim, the Department now believes that the use of gross or net revenue or sales figures alone does not provide a prospective franchisee with a complete picture, that gross or net sales figures alone are potentially ***misleading*** and are not in conformance with Rule 310.156.1 (i.e., "Any advertisement…disclose…such relevant facts concerning the franchise, the terms and conditions…and the material rights and liabilities…). You must delete this information or amend to include expenses and costs … (***emphasis added***)

37. Defendants and Counter-Claimants admit that the RMCF UFOC contains the quote listed at paragraph 37 of the RMCF Motion. However, Defendants and Counter-Claimants deny that the statement contained within the UFOC is true. Defendants and Counter-Claimants specifically deny that RMCF did not or does not "have access to nor knowledge of the expenses

or costs incurred by each of the 169 franchised Stores." RMCF can not possibly make this claim as each and every one of their franchise agreements contains the following provision:

> **15.1 <u>Franchisee Reports.</u>**
>
> The Franchisee shall establish and maintain at its own expense a bookkeeping and accounting system which conforms to the specifications which the Franchisor may prescribe from time to time, including the Franchisor's current "Standard Code of Accounts" as described in the Operations Manual. The **Franchisee *shall supply to the Franchisor*** in a manner and form as the Franchisor may from time to time reasonably require, including:
>
> a. Monthly summary reports, in a form as may be prescribed by the Franchisor, mailed to the Franchisor postmarked no later than the 15th day of the month containing information relative to the previous month's operations; and
>
> b. Quarterly financial statements, prepared in accordance with generally accepted accounting principals ("GAAP"), and consisting of a ***<u>profit and loss statement</u>*** and balance sheet for the ROCKY MOUNTAIN CHOCOLATE FACTORY Store, mailed to the Franchisor postmarked no later than the 15th day following the end of the calendar quarter, based on operating results of the prior quarter, which shall be submitted in a form approved by the Franchisor and shall be certified by the Franchisee to be correct.
>
> …
>
> **15.6 <u>Failure to Comply with Reporting Requirements.</u>**
>
> If the Franchisee fails to prepare and submit any statement or report as required under this <u>Article 15</u>, then the Franchisor shall have the right to treat the Franchisee's failure as good cause for termination of this Agreement.

(***<u>emphasis added</u>***) (Franchise Agreement, at 18-19, attached as Exhibit B-6 to the Anderson Dec.)

38. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 38 of the RMCF Motion.

39. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 39 of the RMCF Motion.

40. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 40 of the RMCF Motion.

41. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 41 of the RMCF Motion.

42. Defendants and Counter-Claimants admit the UFOC contains the statement listed at paragraph 41 of the RMCF Motion.

43. Defendants and Counter-Claimants admit the RMCF Franchise Agreement contains the statement listed at paragraph 43 of the RMCF Motion.

44. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 44 of the RMCF Motion.

45. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 45 of the RMCF Motion.

46. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 46 of the RMCF Motion.

47. Defendants and Counter-Claimants admit the statement of fact contained at paragraph 47 of the RMCF Motion.

## ADDITIONAL DISPUTED FACTS

48. While the UFOC contained the earnings statements as outlined at paragraphs 36, 37 and 46 of the RMCF Motion and, also, encouraged Defendants to seek financial information from existing RMCF franchisees, despite their best efforts, no franchisee was willing to disclose such information to Defendants. (Anderson Dec., ¶16; Pecus Dec., ¶3).

49. Due to their inability to obtain financial information from existing RMCF franchisees, Pecus specifically requested such information directly from RMCF. In an e-mail dated August 14, 2003 (almost one week prior to executing the Franchise Agreement), Pecus writes:

> Hey Kraig, here are some things that will help us get moving as well as things we want you to consider in the initial layout of the store.
>
> 1. Would REALLY like to see a couple months income and expense (especially expense) statements from ANY store. Can blank out anything, names, addresses, whatever. We are creating our monthly budget projections and really would like a baseline to start from. I know for the gyms and real estate we are keeping monthly and since Rocky mtn has reporting requirements for the franchise 6%, we figure you must have something from the stores.

(Pecus Dec., ¶4, Exhibit C-1 (previously marked as Exhibit 101 at Pecus' deposition).

50. Despite its absolute right and access to such information as outlined at paragraph 37 above, RMCF refused Pecus' request. (Pecus Dec., ¶4, Exhibit C-1).

51. In addition to the franchisee's requirement listed at paragraph 37 above, RMCF also owns, operates and controls corporate retail store locations. RMCF maintains separate cost and expense information for each of its corporate owned stores. (Deposition Testimony of former RMCF Controller, John Moore (attached as Exhibit A-9 to the Fortune Dec.) at 26:7-10).

52. Prior to executing the Franchise Agreement, Anderson and Pecus met with the RMCF sales representative, Kraig Carlson. At that meeting, Mr. Carlson explicitly stated that, based upon his experience with RMCF, Defendants' store, located in the Gaslamp District of the City of San Diego, would generate sufficient sales to rank them in the top ten percent (10%) of all RMCF franchise stores. (Anderson Dec., ¶17; Pecus Dec., ¶5).

53. The June 6, 2003, UFOC presented to and, reviewed by, Defendants included, at Item 20 and Exhibit D, a statement disclosing all RMCF franchisees who left the system by way of transfer, closure or termination for the preceding three fiscal years. When Anderson and Pecus inquired as to the reason for franchisees departure from the RMCF system, neither RMCF, nor any representatives thereof, notified them that any such departure was due to the poor financial performance of the franchisee despite its knowledge to the contrary. (Anderson Dec., ¶18; Pecus Dec., ¶7).

54. RMCF has experienced an annual growth rate of 54.6% related to the sales revenue generated by their sale of products to third-party retailers in the years 2004-2007. (Expert Report Prepared by Defendants' Expert, Tony Yip, CPA, (attached as Exhibit A-10 to the Fortune Dec.) at page 8, Exhibit X).

55. The annual growth rate related to sales revenues generated by the RMCF franchising system has been only 2.5% for the years 2004-2007. *Id.*

56. RMCF has experienced an annual growth rate of 47.1% related to the pounds of product sold via their sale of products to third-party retailers in the years 2004-2007. (Expert Report Prepared by Defendants' Expert, Tony Yip, CPA, (attached as Exhibit A-10 to the Fortune Dec.) at page 8, Exhibit XI).

57. The annual growth rate related to pounds sold within the RMCF franchising system has been only .8% for the years 2004-2007. *Id.*

58. At no time did RMCF notify Defendants that it sold products, or intended to sell products, to third-party discount warehouses such as Costco. (Anderson Dec., ¶19; Pecus Dec., ¶9).

59. At no time did RMCF notify Defendants that it sold products, or intended to sell products, to third-party discount internet sites such as Amazon.com, QVC.com, Shop.com, or ProFlowers.com. (Anderson Dec., ¶20; Pecus Dec., ¶10).

60. At no time did RMCF notify Defendants that it would sell products to third-party retailers at a lower cost-per-pound than such products were sold within the franchising system. (Anderson Dec., ¶27; Pecus Dec., ¶18).

61. RMCF sells products to third-party retailers at a lower cost-per-pound than such products are sold within the franchising system. (Deposition Testimony of RMCF Vice President of Sales and Marketing, Edward Dudley (attached as Exhibit A-8 to the Fortune Dec.) at 130:25-131:14).

62. At no time did RMCF notify Defendants that it would sell products to third-party retailers wherein the same product(s) were not available for purchase by franchisees within the franchising system. (Anderson Dec., ¶21; Pecus Dec., ¶11).

63. RMCF sells products to third-party retailers wherein the same product(s) are not available for purchase within the franchising system. (Anderson Dec., ¶22; Dudley Depo. 104:7-105:18).

64. RMCF franchisees, including Defendants and Counter-Claimants, have experienced occasions wherein customers visited their store locations and, either: (1) requested that the franchisee duplicate an RMCF product offered by a third-party retailer, for the same price and/or, (2) provide a similar product to that offered by a third-party retailer, at a commensurate price. On each of these occasions, because of product availability and cost structure associated with the franchisee's operations, the individual franchisee was unable to

make the sale. (Anderson Dec., ¶28, Fortune Dec., ¶14 [anticipated trial testimony of additional RMCF franchisees, Jaci Malone, Candace Malone, Danielle Miller, and Bruce Kuhn]).

65. Prior to this case, RMCF has never terminated a franchisee after issuing only one Notice to Cure. (Deposition Testimony of: RMCF Chief Executive Officer, Bryan Merryman (attached as Exhibit A-5 to the Fortune Dec.) at 215:10-20, RMCF Vice President of Franchise Operations, Greg Pope (attached as Exhibit A-4 to the Fortune Dec.) at 139:20-140:10, former RMCF Director of Franchise Support, Donna Coupe (attached as Exhibit A-3 to the Fortune Dec.) at 132:25-133:4.) Neither had RMCF ever filed a lawsuit after only one Notice to Cure and *before* a Notice of Termination had been sent, nor had it exercised its right to purchase the terminated franchisee's assets. (Coupe Depo. at 147:13-21; Merryman Depo. at 197:11-198:4)

66. RMCF provided Defendants with no opportunity to negotiate the terms contained within the RMCF Franchise Agreement. (Anderson Dec., ¶23; Pecus Dec., ¶13; Pope Depo at 112:18-21).

67. If Defendants were to become RMCF franchisees, they had no choice but to execute the RMCF Franchise Agreement, as presented by RMCF. (Anderson Dec., ¶23; Pecus Dec., ¶13).

68. The only options provided to Defendants by RMCF upon notice of their intent to de-identify themselves as an RMCF franchisee were: (1) remain open as an RMCF franchisee in strict compliance with the RMCF Franchise Agreement, or (2) sell their franchise location. (Anderson Dec., ¶5; Pecus Dec., ¶14).

69. Defendants attempted to sell their franchise location to a third-party buyer but when told why the franchise was for sale, e.g. poor financial performance, the potential buyer declined to make an offer. (Anderson Dec., ¶24; Pecus Dec., ¶15).

70. During the course of settlement discussions during the months of June, July, August and September 2006, RMCF contemplated purchasing all assets related to Defendants' RMCF franchise, including their leasehold interest. The purchase price offered by RMCF was $65,000. (Hearing on Preliminary Injunction, Testimony of RMCF Vice President of Franchise Operations Greg Pope (attached as Exhibit A-2 to the Fortune Dec.), at page 73:20-22).

71. During the months of October 2003 – February 2004, Defendants incurred costs in excess of $300,000 in the build-out and opening of their store location per the specifications provided by RMCF. (Anderson Dec., ¶11; Pecus Dec., ¶8).

72. Had Anderson and Pecus been aware, via the provision of cost and expense information for existing franchisees, that no other RMCF franchisee was obligated to a leasehold rent amount substantially similar to that negotiated for the Gaslamp Franchise prior to execution of the Franchise Agreement, they would not have entered into a lease agreement for 234 Fifth Avenue, San Diego, California 92101. (Anderson Dec., ¶25; Pecus Dec., ¶16).

73. Had Anderson and Pecus been aware, via the provision of cost and expense information for existing franchisees and the cost of goods/suggested retail pricing information contained within the RMCF Operations Manual, prior to execution of the Franchise Agreement, they would not have agreed to become an RMCF franchisee. Nor would they have executed the Franchise Agreement. (Anderson Dec., ¶26; Pecus Dec., ¶17).

74. Had Anderson and Pecus been aware that RMCF sold, or intended to sell, its products to third-party retailers at a cost-per-pound less than that sold within the franchising system, they would not have agreed to become an RMCF franchisee. Nor would they have executed the Franchise Agreement. (Anderson Dec., ¶27; Pecus Dec., ¶18).

75. Anderson was raised in the chocolate manufacturing and retail industry. Beginning in approximately 1974 and continuing through the present date, his mother has worked as a chocolate and candy maker at Russo's Fine Chocolates located in Saugus, Massachusetts. Prior to 1974, she worked at the "Schrafft Candy Factory" located in Boston, Massachusetts. It was during his mother's employment at the Schrafft Candy Factory when she met his father as he was also an employee. Anderson's paternal grandparents, as well as his father's sister also worked at the Schrafft Candy Factory. It has always been his life-long goal to join his family heritage in the candy/chocolate industry. (Anderson Dec., ¶29).

## ARGUMENT

As correctly stated in its moving papers, to prevail on its claim for summary judgment, RMCF must present evidence of no genuine issue as to any material fact. (Plaintiff's Motion for Summary Judgment, at 12, *citing Reeves v. Churchich,* 484 F.3d 1244, 1250 (10th Cir. 2007) ("*Reeves*"). The *Reeves* court further states that, "[w]e view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Reeves*, at 1250, *citing Lawmaster v. Ward,* 125 F.3d 1341, 1346 (10th Cir. 1997).

Here, while a number of facts cited by Plaintiff are, in fact, undisputed, many are taken out of context and/or do not include additional material facts defeating RMCF's claims. The remainder of this brief will be primarily focused upon pointing out such omissions and, therein,

providing the Court with a more accurate picture of the facts, circumstances and relationship giving rise to the current action. In so doing, Defendants and Counter-Claimants are confident that sufficient *disputed* facts exist to bar a finding of summary judgment in favor of Plaintiff in any regard.

**A. Summary Judgment should be DENIED as to Counter-Claimants' First and Second Claims under the California Franchise Investment Law ("CFIL").**

As correctly stated at page 14 of the RMCF Motion, Counter-Claimants' "first and second counterclaims seek damages and rescission, alleging that RMCF violated Cal. Corp. Code §§31300 and 31200 (First Counterclaim) and §§31301 and 31201 (Second Counterclaim)." Counter-Claimants likewise agree that, to be successful in their claims under the CFIL, they must prove, by a preponderance of the evidence that RMCF made an "untrue statement of a material fact" or willfully omitted to state a material fact within the UFOC filed with the California Commissioner of Corporations or, in any other statement made in the context of offering or selling a franchise in the State of California. (Cal. Corp. Code §§ 31200 and 31201).

To defeat RMCF's claim for summary judgment under these two claims, Counter-Claimants need only present one disputed material fact with regard to each element of their claims which, weighed in favor of Anderson, Pecus and SDMS, would go to support their allegations contained within the First Amended Counter-Claims (Doc. No. 100). (*Reeves, supra*.)

Here, disputed issues of fact(s) exist with regards to each of the three allegations made under the CFIL:

**1. RMCF Misrepresentation and/or Omission re Earnings Claim.**

First, Counter-Claimants allege that RMCF made material misstatements of fact and/or omitted material information with specific regard to Item 19 of the RMCF UFOC. As stated at

paragraph 37 of the RMCF Motion, within Item 19 of the RMCF UFOC, RMCF makes the following representation "We do not have access to nor knowledge of the expenses or costs incurred by each of the 169 franchised Stores." In its moving papers, Plaintiff frames the issue around the simple fact that the quoted language is present and, therefore, Defendants were not entitled to rely upon representations of earnings made by RMCF. However, Plaintiff wholly ignores the fact that the statement, itself, is patently false.

As listed at paragraphs 37 and 51 above, not only does RMCF maintain profit and loss statements for each of its corporate-owned retail stores, it *requires* each franchisee to provide quarterly profit and loss statements by the very terms of its own franchise agreement. (Undisputed Fact Number 37[4] ). Given that RMCF *requires* the provision of such information, it can not possibly claim that it doesn't "have access to" the same.

As for RMCF's argument that such information isn't material and/or wouldn't have been relied upon by Anderson and Pecus, again, the statement is, at best, naïve. Not only did the State of California establish the materiality of cost and expense information with regards to Item 19 via its July 8, 2002, correspondence (UF No. 36), Pecus specifically confirmed the materiality of such information via his August 14th e-mail (Disputed Fact Number 49[5]) wherein he requested that RMCF provide any franchisee expense information at its disposal by stating specifically, "Would REALLY like to see a couple months income and expense (especially expense) statements from ANY store." Further, as evidenced by virtually all evidence disclosed to date, the circumstances giving rise to this entire litigation were directly related to Defendants' and

[4] Future reference to all "Undisputed Facts" will be listed as "UF No." with appropriate paragraph numbers provided.
[5] Future reference to all "Disputed Facts" will be listed as "DF No." with appropriate paragraph numbers provided.

Counter-Claimants' inability to meet financial obligations and substantial incurrence of loss in the operation of their RMCF franchise location despite their best efforts[6]. Therefore, representations of earnings and/or RMCF's willful omission of such information is not only material, but exists as the precipitating factor for both Plaintiff's and Defendants' entire claim.

**2. RMCF's Misrepresentations and/or Omissions re Disclosure of Transfers, Closures or Terminations of RMCF Franchisees.**

In addition to its false statements and refusal to provide information related to the actual operating cost and expense information of existing RMCF franchisees, Plaintiff wholly misrepresented the nature of previous franchisees' departure from the RMCF system. When, upon reviewing Item 20 and Exhibit D of the RMCF UFOC (Pope Dec., Exhibit F, page 28, Doc. No. 133-8), Anderson inquired as to the large number of franchisees who left the RMCF system in the preceding year, he was told it was the franchisee's choice to retire and/or depart for some other personal reason. (DF No. 53). Never did RMCF disclose to Anderson or Pecus that a substantial number of franchisees had closed due to poor business performance. (DF No. 53). Should this case proceed to a trial of the merits, Counter-Claimants intend to present facts, both by live testimony and by documentary evidence, supporting their allegation that, not only were a substantial number of closures or transfers directly tied to poor business performance but also that RMCF had full knowledge of the same at the time contrary representations were made to Anderson and Pecus.

**3. RMCF's Misrepresentations and/or Omissions re Competition By RMCF in the Marketplace.**

[6] RMCF lists as the precipitating factor to filing its original complaint as Defendants' May 11, 2006 correspondence. (RMCF Motion, ¶¶ 8, 9). Included within the May 11, 2006 correspondence is a specific recitation of why Defendants were unable to continue as an RMCF franchisee, i.e. cost structure and cash flow. (UF No. 8). Further, Counter-Claimants' damage claim is based, in substantial part, upon the financial losses incurred in the operation of their RMCF franchise. (Doc. 100, ¶¶ 33, 52, 60).

Section 310.111 of the California Administrative Code requires that a franchisor wishing to register to do business within the State of California submit a Uniform Offering Circular ("UFOC") in accordance with guidelines established by the North American Securities Administrators Association ("NASAA"). NASSA's form UFOC contains, at Item 1, a statement of competition related to the prospective franchisee's business. Several on-line resources define "competition" as:

a. A business relation in which two parties compete to gain customers. wordnet.princeton.edu/perl/webwn;
b. Similar businesses providing products or services to your potential customers. www.onlinewbc.gov/docs/starting/glossary.html;
c. The interactions between two or more sellers or buyers in a single market, each attempting to get or pay the most favorable price. www-personal.umich.edu/~alandear/glossary/c.html;
d. Where two businesses offer similar products or services, they are in competition with each other. www.z2z.com/site01/itglos01.html;

(Fortune Dec., ¶17).

Item 1 of RMCF's UFOC makes a statement of "Market Competition" including Godiva, Sees Candy, Fanny May, Fanny Farmer and other local independent candy stores and "specialty food stores." (Anderson Dec., ¶30, Exhibit B-5). RMCF does not, however, list itself among potential competitors of its franchise system. Ordinarily, this omission wouldn't seem problematic. It's uncommon to find a situation wherein a franchisor offers a substantially similar product for sale to consumers outside its franchise system. After all, a MacDonald's hamburger can not be purchased at your local warehouse superstore. Neither can a consumer contact Jiffy Lube (franchisor) to schedule an oil change any more than an ice-cream junkie can have their favorite frozen treat delivered directly to their door by Cold Stone Creamery, TCBY or by an internet retailer such as Amazon or QVC.com. If any of the foregoing were true, where would

the value be in purchasing the rights to sell such products from the franchisor? This is precisely the question asked by Defendants and Counter-Claimants in their fourth affirmative defense alleging lack of consideration and, under their four counter-claims asserting that RMCF's failure to disclose its own competition was an omission of fact material to the agreement.

RMCF sells its products to third-party retailers whom, Plaintiff is well aware, intend to re-sell such products to the end consumer. In making these sales, not only is RMCF providing an additional source of product to the consumer, the insult is amplified by the fact that the products are offered at a discounted price and, on many occasions, can not even be duplicated by the franchisee. (DF Nos. 61, 64). RMCF will, no doubt, attempt to minimize its sale of product outside the franchising system. But, in the last four years, Plaintiff has realized an annual growth rate of 54.6% related to sales outside the franchise system while franchise sales have increased at the dismal rate of 2.5%. (DF Nos. 54, 55).

RMCF's competition is material. It's incredulous to assert that the availability of the same quality RMCF product to consumers, at a lower cost-per-pound, wouldn't influence a prospective franchisee's decision to invest hundreds of thousands of dollars just to have the right and privilege of attempting to sell the very same product at almost double the cost.

**B. Summary Judgment should be DENIED on Counter-Claimants' Third Claim under the California Business and Professions Code ("B&P Code").**

Under California Business and Professions Code section 20020, "…no franchisor may terminate a franchise prior to the expiration of its term, except for good cause." While the B&P Code specifically states that a franchisee's failure to meet its monetary obligations satisfies the good cause requirement, the facts giving rise to RMCF's termination are not narrowly confined to Defendants' simple failure to pay royalties. Here, Defendants' failure to pay royalties came

only *after* RMCF filed legal action against them and the parties were attempting to settle their disputes without the need for protracted litigation. (Doc. No. 133-2, Pope Dec., ¶¶ 18-21). Further, RMCF sent its "Notice of Termination" on the very same day Counter-Claimants, through their counsel, indicated their intent to file counter-claims should Plaintiff persist in its unreasonable settlement position. (Fortune Dec., ¶3, Exhibit A-1; Pope Dec. Exhibit E, Doc. No. 137-7). At best, RMCF's motive in terminating Defendants' Franchise Agreement in October 2006 is suspect. At its most nefarious, RMCF's termination is clearly retaliatory and made in response to Anderson and Pecus' refusal to simply go quietly and acquiesce to Plaintiff's unreasonable demands. This inference is further supported by the fact that never before has RMCF terminated a franchise agreement for the franchisee's failure to pay royalties. (DF No. 65).

**C. Summary Judgment should be DENIED on Counter-Claimants' Fourth and Sixth Claims for Fraud in the Inducement and Fraud.**

Counter-Claimants' allegations made under their fourth and sixth causes of action for fraud in the inducement and fraud are substantially similar to, if not a mirror of, their claims under the CFIL. In the interest of brevity, Anderson, Pecus and SDMS respectfully invite the Court's attention to the discussion contained at paragraph A., beginning at page 18, above.

**D. Summary Judgment should be DENIED on Counter-Claimants' Fifth Claim for Unconscionable Contract.**

Section 4-2-302 of Colorado's Commercial Code states,

> (1) If the court, as a matter of law, finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, …
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting,

purpose, and effect, to aid the court in making the determination.

### 1. Section 4-2-302 of Colorado's Commercial Code applies to the RMCF Franchise Agreement.

Plaintiff's argument that section 4-2-302 should not apply to the matter at hand because the contract at issue is a franchise agreement is without merit. In *Colorado Carpet Installation, Inc. v. Palermao*, cited at page 24 of the RMCF Motion, the Court entered into the following discussion with regards to the application of the Uniform Commercial Code ("UCC") in mixed contracts (i.e. a contract for services <u>and</u> the sale of goods):

> The performance of some labor or service frequently plays a role in sales transactions. "Goods," however, are not the less "goods" merely because labor or service may be essential to their ultimate use by the purchaser. The mere furnishing of some labor or service, in our view, should not determine the ultimate character of a contract for purposes of … the Uniform Commercial Code. Rather, the controlling criterion should be the primary purpose of the contract -- that is, whether the circumstances underlying the formation of the agreement and the performance reasonably expected of the parties demonstrates the primary purpose of the contract as the sale of goods or, in contrast, the sale of labor or service. We agree in this respect with the following statement in *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir. 1974):
>
>> "The test for inclusion or exclusion is not whether [goods and services] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved *(e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved *(e.g.,* insulation of a water heater in a bathroom)."

*Colorado Carpet Installation, Inc. v. Palermao*, 668 P.2d 1384, 1388. ("*CCI*"). The Court in *CCI* went on to say,

> This "primary purpose" test, we believe, is designed to promote one of the expressed statutory policies of the Uniform Commercial Code -- "to simplify, clarify, and modernize the law governing commercial transactions." (citation omitted). Useful factors to consider in determining whether "goods" or "service" predominates include the following: the contractual language used by the parties,

> (citations omitted); whether the agreement involves one overall price that includes both goods and labor or, instead, calls for separate and discrete billings for goods on the one hand and labor on the other (citations omitted); the ratio that the cost of goods bears to the overall contract price (citations omitted); and the nature and reasonableness of the purchaser's contractual expectations of acquiring a property interest in goods…

*Ibid*. at 1388-1389. Further, in *CCI* the Court came to the ultimate conclusion that the UCC did, in fact, apply to a contract for the sale and installation of carpeting.

Here, as in *CCI*, the contract at issue, the RMCF Franchise Agreement, is a mixed contract. On one hand, the franchise agreement grants franchisees the rights and license to use the RMCF marks in the operation of their retail location. And, for this benefit, the franchisee is required to pay an "initial franchise fee" in an amount ranging between $19,500 - $49,000. (Exhibit F to the Pope Dec., page 2, Doc. No. 133-8; Anderson Dec., ¶31, Exhibit B-6, page S00788[7] and S00820). However, as stated at paragraph 5 of the RMCF Motion, the Franchise Agreement also *requires* the franchisee "to purchase certain RMCF products ("Factory Candy")" from Plaintiff. In fact, once the initial franchise fee is received and the license conferred, essentially every dime of income generated by RMCF in relation to the franchise agreement is as a direct result of the sale of goods by and between the parties. Not only does Section 2.2 require the franchisee to devote a minimum of 50% of its total retail space to RMCF Factory Candy, Section 13.4 of the Franchise Agreement states, "The Franchisee will be required to purchase all of its Factory Candy from the Franchisor or its Designee." (Anderson Dec.,¶32 Exhibit B-6, pages S00786 and S00800).

[7] Section 4.1 of the Franchise Agreement reads, in pertinent part, "The Franchisee acknowledges and agrees that the initial franchise fee represents payment for the initial grant of the rights to use the Marks and Licensed Methods…"

To make matters more clear, one of the reasons listed by RMCF as a motivating factor for terminating Defendants agreement was their failure to purchase RMCF Factory Candy as required by the franchise agreement. Further, RMCF's damage calculation in the amount of $219,972 is based wholly upon monies allegedly owing by Defendants to RMCF as the direct result of the purchase and sale (or anticipated purchase and sale) of RMCF products (i.e. goods). (Fortune Dec., ¶15, Exhibit A-11, page 2).

Therefore, because the "primary purpose" of the RMCF franchise agreement is for the sale of chocolate and confectionary products (i.e. goods), section 4-2-302 of the Colorado Commercial Code applies in this case.

**2. Under the Colorado Commercial Code and interpreting case law, the RMCF Franchise Agreement is Unconscionable.**

In its effort to defeat Counter-Claimants allegations under the Colorado Commercial Code, Plaintiff cites to the Colorado Court of Appeals decision in *LePrino v. Intermountain Brick Company* ("*LePrino*") for the notion that a finding in favor of Counter-Claimants in this regard depends upon "a showing of both substantive and procedural unconscionability." (RMCF Motion, at page 25). This *inference* drawn by Plaintiff from the *LePrino* case is simply incorrect. The entirety of the Court's discussion involving unconcsionability is contained in parenthesis at page 25 of the RMCF Motion with the only exception that, the Court included one additional sentence stating, "Contract terms, particularly in a transaction involving a consumer, will be found unconscionable when they defeat the reasonable expectations of the parties." *LePrino v. Intermountain Brick Company*, 759 P.2d 835, 836 (Colo. App. 1988). Nowhere in

*LePrino*, nor in the Supreme Court of Colorado decision *Davis v. M.L.G. Corp.*[8], relied upon by the *LePrino* Court, does the Court find that unconscionability can only be reached after a showing of "procedural" unconscionability. Instead, the Colorado case law on unconscionability requires just what the *LePrino* and *Davis* courts indicated, "…evidence of some overreaching on the part of one of the parties, such as that which results from inequality of bargaining power…together with terms unreasonably favorable to the first party." *Ibid*.

In defeating RMCF's claim, Counter-Claimants need not even dispute the additional factors indicating an existence of unconscionability, derived from the District Court's decision in *Mullan v. Quickie Aircraft Corporation*[9] and, laid out at pages 25-26 of the RMCF Motion. Addressing the first four:

(1) A standardized agreement executed by parties of unequal bargaining strength. The RMCF Franchise Agreement is a standardized agreement in that Plaintiff does not negotiate its terms. (DF No. 66). The parties are of unequal bargaining power, RMCF, a nationally traded corporation with a Common Stock value of $13,615,922 for the fiscal year end February 28, 2003 and Defendants, individuals with no specialized training or education in business matters. (Anderson Dec., ¶34, Pecus Dec., ¶19, Fortune Dec., ¶16, Exhibit A-12).

(2) A lack of opportunity to read or become familiar with the document before signing it. Prior to execution and payment of the initial franchise fee, Anderson and Pecus were provided the opportunity to review the Franchise Agreement. They were not, however, permitted to read the Operations Manual, upon which they were required to obey by the terms of the Franchise Agreement. Importantly, it is the Operations Manual and <u>not</u> the Franchise Agreement

---

[8] *Davis v. M.L.G. Corp*, 712 P.2d 985 (Colo. 1986) ("*Davis*").
[9] *Mullan v. Quickie Aircraft Corporation*, 797 F.2d 845, 850 (10th Cir. 1986) ("*Mullan*").

that fully addresses and explains the operating protocols for an RMCF franchise including, but not limited to, RMCF product cost structure, suggested retail pricing, estimated employee hours, payroll, and authorized product and vendor lists. (Anderson Dec., ¶3, Exhibit B-3). Each of the aforementioned items tie directly to Counter-Claimants' motivation for wanting to end their relationship with RMCF and are cost elements of their ultimate damage claim.

(3) Use of fine print in the portion of the contract containing the provision. As stated above, the issue isn't that fine print was utilized to keep Defendants in the dark, they never even had the opportunity to review the operative and material provisions of the entire agreement before execution.

(4) Absence of evidence that the provision was commercially reasonable or should have been reasonably anticipated. Paragraph 45 of the First Amended Counter-Claim identifies six specific provisions of the RMCF Franchise Agreement as unconscionable. The four most grievous are addressed below:

a. As stated in their Offering Circular, the costs associated with establishing a new RMCF franchise average between $150,000 and $430,000. (Anderson Dec., ¶10, Exhibit B-1). Yet, under the terms of the franchise agreement, in the event of a franchisee's default or termination, regardless of the time in business, RMCF may exercise its option to repurchase the franchise at fair market value, less any amount apportioned to good will. (*See* Franchise Agreement, paragraph 18.4). In this case, Defendants incurred costs in excess of $300,000 in opening their franchise location. (DF No. 71). Then, only two and a half (2 ½) years later, RMCF quantified the "fair market value" of the Gaslamp Franchise at $65,000. (DF No. 70). Therefore, under this contract provision, RMCF is able to purchase for themselves, or offer for

sale to a third party, an existing franchise location only paying 20% of the franchise's actual cost. Therefore, enforcement of provision 18.4 results in an 80% loss of value to Defendants' store in only two years time, *in addition to* all business losses suffered since opening.

b. Under paragraphs 2.2 and 10.1(e) of the RMCF Franchise Agreement and certain other provisions of the RMCF Operations Manual, Counter-claimants are required to devote a minimum of 50% of all display space to the sale of RMCF "Factory Candy". This is so regardless of the franchisees financial ability to pay RMCF for the product. Therefore, if they can't afford to purchase candy, that means they are unable to properly stock their shelves and, under the express terms of the Franchise Agreement, RMCF can terminate and elect to purchase the franchisee's assets at the drastically discounted rate listed at paragraph a. above.

d. Paragraphs 18.2(e), 18.3, 18.4 and 18.5 permit RMCF to terminate the franchise agreement and enforce its rights of re-purchase in the event that the franchisee breaches a "related agreement," including the lease agreement. Therefore, if the franchisee becomes in default of his/her/its lease agreement or, fails to promptly pay a vendor, regardless of the reason, RMCF can, again, terminate and elect to purchase the franchisee's assets at the drastically discounted rate listed at paragraph a. above.

e. Paragraphs 20.1 and 20.2 prohibit any franchise from owning or operating any business where more than 10% of the gross retail sales are generated from the manufacture or sale of chocolate or "other non-chocolate confectionary items" for two years within a ten-mile radius of their existing franchise location or within ten miles of any other RMCF franchise. These provisions apply regardless of the franchisee's prior work history, experience or education within the chocolate or candy making profession. In this case, Anderson was raised in the

chocolate manufacturing industry and it has been his life-long goal to one day join his family in that endeavor. (DF No. 76).

Based on the foregoing, if the franchisee finds itself in financial despair, it has no option other than to attempt a sale (of its failing business) or acquiesce to a termination by RMCF. In which case, also by terms of the franchise agreement, RMCF may sue the terminated franchisee for lost future profits as they have in this case. Further, the RMCF Motion asserted no specific evidence justifying or even addressing any one of the provisions above. As such, it has failed, under *Mullan* to show the reasonableness of a single one of the provisions listed.

In summary, not only were Defendants denied the opportunity to review all provisions they were agreeing to abide by prior to execution, the RMCF Franchise Agreement was utterly non-negotiable. This, almost by definition, equates it to a contract of adhesion and is against public policy.

**E. Counter-Claimants' Seventh Claim for Breach of Contract.**

Per the Proposed Pre-Trial Order filed on September 13, 2007 (Doc. No. 138), Counter-Claimants will not be pursuing this claim at trial and will be filing a voluntary dismissal. Therefore, there is no need to address the RMCF Motion in this regard.

**F. Summary Judgment should be DENIED on Counter-Claimants' Eighth Claim for Breach of Good Faith and Fair Dealing.**

Plaintiff's only attempt to defeat Counter-Claimants' allegations that RMCF breached its duty of good faith and fair dealing with regards to its performance under the Franchise Agreement is to say, "Through the course of discovery, Defendants have not identified a single instance where RMCF breached discretion provided to it under the Franchise Agreement."

(RMCF Motion, page 31). To contradict this claim, Defendants and Counter-Claimants need only look to the sequence of events leading up to litigation in this case.

First, all three RMCF executives with authority and oversight over the franchise system[10] agreed that Plaintiff has *never* terminated a franchise agreement for failure to pay royalties or the sale of unauthorized product, despite its absolute right to do so under the terms of the franchise agreement. (DF No. 65). Neither had RMCF ever filed a lawsuit after only one Notice to Cure and *before* a Notice of Termination had been sent, nor had it ever before exercised its right to purchase the terminated franchisee's assets. (DF No. 65). When each of these situations arose with Defendants and Counter-Claimants, RMCF had the discretion to pursue any remedy available and, on each occasion, RMCF chose the most severe, despite its failure to do so on one other occasion in its twenty-six year history. If that's not a breach of discretion with regards to Anderson, Pecus and SDMS' relationship with RMCF, Plaintiff is going to be severely challenged to state what is.

Additionally, as shown via the recited facts in all preceding paragraphs, from execution of the Franchise Agreement, the RMCF franchisee is set up for failure, while RMCF suffers no monetary consequence.

**G. Summary Judgment in should be DENIED on Plaintiff's Claim for Breach of Contract.**

As stated at page 13 of the RMCF Motion, to be successful on its breach of contract claim Plaintiff's first task is to present undisputed evidence of the existence of a contract between the parties. Based upon the foregoing and despite RMCF's naïve assertion to the

[10] Bryan Merryman, Chief Executive Officer and Chief Operating Officer; Greg Pope, Senior Vice President of Franchise Operations; and Donna Coupe, Director of Franchise Support.

contrary, the question of a valid contract's existence in this case is highly disputed. If Counter-Claimants are successful on one of their claims alleging misrepresentation or their claim for unconscionability, no contract exists upon which to grant RMCF's requested relief. Therefore, until Counter-Claimants' claims are heard and decided on their merits, RMCF is not entitled to judgment on its claim for breach of contract.

Dated this 7th day of November, 2006.

Respectfully submitted,

s\ *Rebecca J. Fortune*

Rebecca J. Fortune
Lynn & Fortune, LLP
2171 India Street, Suite C
San Diego, California 92101
Telephone: (619) 233-9464
Facsimile: (619) 702-6911
e-mail: rfortune@lynnfortunelaw.com

**DECLARATION OF SERVICE**

*Rocky Mountain Chocolate Factory, Inc v. SDMS, Inc et al*
United States District Court for the District of Colorado
Civil Action No. 06-cv-01212 WYD-BNB

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 2368 Second Avenue, San Diego, California 92101.

I hereby certify that on September 20, 2007, I electronically filed the foregoing:

1. **DEFENDANTS' AND COUNTER-CLAIMANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
2. **DECLARATION OF REBECCA J. FORTUNE**
3. **DECLARATION OF THOMAS ANDERSON**
4. **DECLARATION OF KENNETH PECUS**

with the Clerk of the Court using the **CM/ECF** system which will send notification of such filing to the following email addresses:

Leonard H. MacPhee
lmacphee@perkinscoie.com

Romney Sharpe Philpott, III
rphilpott@perkinscoie.com

Executed September 20, 2007 at San Diego, California.

s/ *Rebecca J. Fortune*__
Rebecca J. Fortune